Thank you, Your Honor. May it please the Court, my name is Jesse Wing and I'm here on behalf of the Washington Employment Lawyers Association, amicus in this case. This case arises from a summary judgment granted for the defendant in which Ms. Rock, the appellant, alleged that she refused to lie to a third-party auditor her employer was seeking certification from, and that her refusal to lie was a substantial factor in her discharge from employment. The trial court dismissed Ms. Rock's wrongful discharge in violation of public policy claim, state law of Washington, on the ground that Washington has not expressed a clear policy of consumer protection. Mr. Wing, just to clarify something, as I read the district court's opinion, he had alternative grounds. He first said there was not a constructive termination, and then he second said even if there was a constructive termination, there's no clear policy under Washington law. As I understand it, you're addressing the second of the issues, but are you addressing the first one? No, Your Honor. So the first one appellant's counsel will be addressing. That's correct. All right. But if, for example, we were to affirm the district court on the first issue, ground he stated, that there wasn't a constructive termination, then I take it we wouldn't reach this issue that you're arguing. I suspect not. Okay. Thank you. Amicus would like to make four points in their brief time. First, the Consumer Protection Act of Washington and the Federal Trade Commission Act are sources of clearly mandated public policy for the purpose of satisfying the first element, that is the clarity element, of the public policy tort. This was not recognized by the trial court in this case. Clarity is a question of law and, therefore, is properly resolved by this court. Second, Amicus would like to show that the plaintiff states a claim for the public policy tort, regardless of whether there was an actual violation of the underlying source. In this case, the Consumer Protection Act or the Federal Trade Commission Act. It's simply irrelevant whether the employer has consummated a violation. Third, if the employer had lied or, in the future, is planning to lie to the third-party certification organization and they, therefore, obtain the certification fraudulently, that is a violation of the Consumer Protection Act and the Federal Trade Commission Act. When companies lie to obtain third-party certifications, that amounts to false advertising. The final point is that if the employee. Hold on that one for a moment. You state a claim under the Consumer Protection Act if you're injured in your business or property by reason of some deceptive act. But does that statute apply if an employee is fired? Her injury is not the business or property, but her loss of her employment. So I understand the Consumer Protection Act being relevant to whether there's a policy and a termination in violation of public policy if there was a termination. But I don't see how there can be a Consumer Protection Act claim by the terminated employee. Your Honor, amicus is not taking a position on whether the appellant has an actual Consumer Protection Act claim. The point that we want to make is that terminating an employee because they successfully prevent the employer from consummating a violation of the underlying source states a claim under the public policy tort. Okay. Thank you. Okay. The fourth point that we wanted to make is if the employee refused to lie or blew the whistle to prevent fraudulent certification and her conduct was a substantial factor in a discharge from employment, she would prevail and therefore is entitled to bring her case to the jury and satisfy the jeopardy element. Now, specifically, the State Supreme Court in Washington in Hubbard v. Spokane has on three occasions approved a West Virginia Supreme Court decision called Harless v. First National Bank. Which stands for the proposition that a bank employee who tried to enforce the State's Consumer Protection Act and was terminated thereby states a claim for public policy. And specifically in Hubbard, the Court said that the Hubbard facts, which were to enforce a zoning ordinance, were very much like the Harless decision. It seems quite clear that the State of Washington through the Supreme Court has found a clear public policy in Consumer Protection. The Consumer Protection Act is quite broad. It says its purpose is to complement the body of Federal law which governs unfair, deceptive, and fraudulent acts in order to protect the public and foster fair and honest competition. And the CPA was intentionally drawn very broad to try to get at the various types of deceptions that the public might be subject to. Now, it covers all deceptive acts and practices. It covers all unfair methods of competition. It's a parallel provision giving State court jurisdiction to Section 5 of the Federal Trade Commission Act. I believe that's correct. The same language. I think that's correct. With regard to without having to actually prove a violation of the underlying source, the focus of the Consumer Protection Act includes the capacity to deceive. Okay? And that would require that the employee who gets fired for successfully stopping an employer from engaging in a deceptive act has accomplished the goal. And if we allow employers to terminate somebody after listening to them, then we will completely undermine the ability of employees to step forward, accomplish the public interest, if they're successfully accomplished the public interest but lose their job. I want to give as an example of the concern that if an employer actually lied to, in this case, the ISO, which is the International Standards Organization, which very clearly in its own mission is to educate the public and to require that those members who seek certification establish a clear policy following the procedures. Your time is just about up. If you go further, you'll be taking it away from your time appellate. Okay. If I may sum up and simply say there are two purposes of the public policy tort, to prevent and deter employers from frustrating public policy. Okay. But if you're summing up now, we have to take it off your appellate's time. Thank you. The gentleman is right if you're an amicus. I agree. Thank you. Okay. Good morning. My name is Kim Koenig. I represent appellants Christy Morden and Polly Rock. Initially, I'd like to address the question that you raised by amicus counsel about the issue of constructive discharge. Isn't that the first issue that we have to think about? Well. If there is, in fact, not a discharge, not a constructive discharge, then it doesn't matter if there's a violation of or if somebody, you know, asks someone to do something contrary to the statute. That's true. But it's appellant's position that there actually is no issue, and I'll tell you why. Judge Zilley permitted this case to go to the jury on the question of constructive discharge on exactly the same facts that he dismissed the consumer protection claim on. The only difference is the protected conduct that was involved. My client engaged in two forms of protective conduct, Polly Rock. She refused to lie to the auditor. She reported ISO fraud, and she also gave testimony against her boss or cooperated in a sexual harassment investigation against him, the same manager who directed her to lie to the auditor. She revealed this information in the same interview with Linda Howitson, who was the HR manager put in charge of investigating these claims. And from that point forward, the facts are exactly the same. Polly Rock suffered the exact same acts of retaliation. The question was just for the jury. Were they because she engaged in the protected conduct of refusing to lie to the auditor or was a substantial factor that she participated in the sexual harassment investigation? So if the court permitted the claim to go forward on constructive discharge on exactly the same facts, under RCW 4960 in Title VII, as a matter of law, he was required to permit the case to go forward to the jury on constructive discharge under the public policy tort claim. Instead, what the court did is substitute its own judgment for that of the jury. Well, I think it might be more helpful to me, at least, if you address the merits of whether there was a constructive discharge. Whether the judge let something go to the jury that maybe he shouldn't have, you know, doesn't really answer that. The question, as I see it raised in the appellate briefing here, at least a preliminary question, was there a discharge? And if there was a discharge, then we can address whether it was a retaliatory discharge. Yes, there was a discharge. Ms. Rock alleged that she was expressly discharged in violation of public policy and or constructively discharged in violation of public policy, or a hybrid, mixture of the two. But when? I mean, she wasn't fired, right? She did refuse. She was discharged. She left work and then didn't come back. Well, the question really is when did the constructive discharge occur? Did it occur on October 11th or 12th when she left work so sick that she required medical attention? Isn't the question, though, not when did it occur? That's assuming the answer. That's assuming there was a constructive discharge, which I'm asking you to address. Okay. Which, as I understand the law, requires, you know, that there be intolerable circumstances. If an employer doesn't say you were fired, there are cases where we say it's a constructive discharge. But I really, at least for me, the other panel members may be with you without argument, but at least for me, I need to understand more why we should say she was discharged. All right. Here are the facts of the case. Ms. Rock was the best administrator Manager Norton ever had until she was directed by him to lie to an auditor, and she told him that she would not do so and reported his directive to HR. After that, she suffered a pattern of retaliatory treatment, which constitutes aggravating factors required for a constructive discharge. After she refused to lie to the ISO auditor and reported his directive to lie to the HR representative, Linda Howitson, she was stripped of her duties as the ISO Administrator of the Product Support Department. That was a huge portion of her work. The record reflects, as noted in the brief, that she was the point person with whom the auditor conversed when he came to determine whether or not Intermec had complied with its ISO certification requirements. She lost about 75 percent of her responsibilities. Seventy-five to 80 percent. That was the first act. Okay. But on the other hand, did she lose any pay? Was she moved to a different office? Were her work conditions changed? Other than the issue of what her duties were. I don't believe what didn't happen to her is the relevant inquiry. The relevant inquiry is what did happen to her. She lost 75 to 80 percent of her job, which is in itself a constructive discharge. Tell me, is there a precedent that says that? Yes. If somebody could say that, like, if the Congress were to eliminate 75 percent of our caseload, for example, and we got the same chambers and we worked the same hours and had the same pay, we just had to do 25 percent less appeals, would we be constructively discharged? What if they took your work away from you because you refused to lie to an auditor from the Office of Government Accounting? Well, again, that goes to the retaliation, but is it a discharge? The retaliation is part and parcel of the discharge. It's the pattern of retaliatory treatment that she received that leads to her constructive discharge. After her ISO work was taken away, she then wrote a letter begging for help and addressed this letter to the Vice President of Human Resources and to the corporate counsel, Mr. Fred Stuffin. That letter appears as evidence of record. I believe it's ER 123 and 124, 122 and 123. She emails this letter to Heather Davis and Fred Stuffin on October 8, 1999, at 1248 p.m. That very afternoon at 107, her letter begging for help is read by the Vice President of Human Resources, Heather Davis. That fact is reflected in further evidence of record, document number 84. Then, that was a Friday, October 8th was a Friday. Mr. Stuffin, corporate counsel, did not apparently read the letter from Ms. Rock detailing the retaliation and begging for help until the morning of October 11th, 1999, the following Monday morning at 912 a.m. That fact appears in FER 86. That very afternoon at 354 p.m., after the Vice President of Human Resources had received her plea for help and her detailed allegations of the retaliation, the very day that the corporate counsel received her plea for help, she was stripped of the remaining 80 percent of her job duties. In ER 125, which was an email from her supervisor, Ron Norton, who had never emailed her like this before, given that she was the best administrator that he had ever had. He said that twice in his deposition. At 354 p.m. on October 11th, 1999, the very day corporate counsel read it, two days after her plea for help was received by the Vice President of Human Resources, Mr. Norton stripped her of her supervisory capacity in a public way, sending the email to all of the employees whom she supervised, also reflected in ER 125, took away not only her supervisory capacity over these employees, but also took away her job duties related to them. And in his deposition, and the record reflects this, it's cited in the brief written by the defendants, he states that it wasn't Ms. Rock's fault that he was doing this, but he thought he could somehow better handle the gossip and rumor mongering that was going on in dispatch. That was his purported legitimate justification for stripping of her supervisory capacity and taking over all of her job duties. Now, normally, I mean, there are cases that say temporal proximity alone is a sufficient factor to send a case to the jury when there are competing inferences of retaliation. However, Ms. Rock did not simply present temporal proximity. She went on to allege numerous other factors which evidenced pretext. She presented direct evidence of pretext. Manager Larson told her, Peggy Larson, Quality Assurance Manager, you can't go to HR. You'll lose your job if you go to HR. Managerial statement, admission by a corporate officer, admissible under Godwin, which is cited in the brief. ER 204 lines 14 through 23. She presented additional direct evidence that her job was threatened, and the request that she lie was a conditioned precedent to her continued employment with the company. Norton said, do as you are told, when she told him that she would not lie to the auditor. I took up some of your time with my questions, and if you need it, I see you only have about a minute left in light of the amicus. I can give you a couple of extra minutes. I cannot leave this courtroom without discussing the discovery issue, Your Honor. Also, I just wanted to know if Kristi Morden. I represent Ms. Morden, too, and there's one element of her claim that I would like to make clear for the record. Ms. Rock alleged that the court's refusal to provide her discovery into a variety of factors, including internal audit reports of the company related to hazardous fire combustible printers that were being produced and sold by her company. Auditors were being lied to about it. That's all detailed in the brief, and the record supports it. She also alleged that one other source of public policy for her claim was the Federal False Claims Act. Public policy clearly expressed in that act prohibits fraud against United States government, and Ms. Rock detailed also in her pleading supporting this brief that her employer had many contracts with the United States government, U.S. Navy, United States Post Office, and she sought to prove to the court that had she not acted, public policy could have been violated. She wasn't permitted to discover any of the evidence which supports the jeopardy element of the Consumer Protection Act claim, which is extremely relevant to prove that she was unlawfully discharged in violation of public policy. If she wasn't able to receive discovery on the fraud that the company was actually committing, and the ISO fraud goes back to September of 1997. The district court limited it to what happened after she was no longer physically present in the workplace. But the complaint alleges, and ER-262 clearly shows that as early as September of 1997, the quality engineering manager, Dennis Williams, the same man who manufactured the lie that Rock was supposed to tell in this case, was directing other individual employees at the company to lie, to manufacture documents if they didn't exist, and backdate them. Your time is really up, but I would like to hear a little bit about Ms. Morgan's appeal. Yes. So I'll give you another two minutes. All right. Or three minutes. When you're five minutes over, we're going to stop. All right. And I'll add the time to your opponent's argument. I appreciate your fairness. The issue I want to address in relationship to Ms. Morgan's appeal is the question raised by the defendants as to whether or not the acts of retaliation that she alleged were not even addressed by the district court despite her clear allegations in supporting evidence. The defense say they happened prior to her protected conduct, and therefore, they can't be acts of retaliation. That's axiomatic. If the acts of retaliation occurred prior to protected conduct, then, of course, they cannot be acts of retaliation. But those are not the facts of this case. And that argument by the defendants fails to consider two things. One, Ms. Morgan repeatedly asked to receive job training and or the opportunity to apply for the level one technical position throughout the month of October. And all of that evidence is provided to the court in the further evidence of record filed in support of our last brief. And in those FERs, she details notes where she continues to ask for job training and the opportunity to apply for the level one technical position throughout the month of October. Secondly, the defense argument fails to take into consideration that Ms. Morgan alleged that there were three actors who retaliated against her, not just one. She alleged that Mr. Munn, her managerial HR person, and Linda Howitson both retaliated against her. And the acts of retaliation that were committed by Howitson and Munn occurred in the month of October 1999, not in September. Okay. We'll have to conclude the argument. Thank you. Thank you very much for your argument. We'll now hear from Mr. Sondag. And I'll ask that we add five minutes to your time, but you don't have to take it all. Thank you. I appreciate that, Your Honor. May it please the court and counsel, Tom Sondag appearing on behalf of the FLEs today. I'd like to address first the initial question that Your Honor had with respect to whether there was a constructive discharge in this case, as it applies to Plaintiff Rock's claim for discharge in violation of Washington public policy. The facts essentially are these. She arrived at work on October 12 and saw an e-mail from her supervisor indicating that he wished to take over the day-to-day supervision of four dispatchers. Ms. Rock believed that that usurped 75, she claimed 75 to 80 percent of her work responsibilities. She left work that day. There was no effort made to resolve the issue. She simply left work. But she says she wasn't terminated at that point. She says she was terminated some months later. She remained on paid leave for over six months after leaving work. And under Washington law, we believe that clearly does not meet the standard. As a matter of law, there's not a constructive termination on those facts. Washington law requires that an employer deliberately make working conditions so intolerable such as to force a reasonable person to resign. And we believe that these facts do not support that. Under Washington law, intolerable conditions are shown by aggravating circumstances or a continuous pattern of discriminatory treatment. We believe, again, that the record is not sufficient to support that. And as a matter of law, it does not support a constructive termination. If somebody is asked to lie, you know, to lie in connection with some standards audit, could that create a constructive discharge? It's a pretty extreme request to be made to an employee. I could say an employee who didn't want to lie might feel they couldn't continue working at the company. Well, in fact, she indicated she would not lie. And, of course, as the facts show, it's undisputed there never was a lie told. But she left work, you understand, before this audit took place. And so in our view, the request to lie, again, looking at the evidence in the light most favorable to her, does not support a claim of constructive termination. I mean, she says her facts are, I was told to lie, and I said, or I was told to give this explanation, and I said that's not the truth. And her supervisor said, do as you're told. You know, is your point that that's not a constructive discharge because it's one it's like one incident? It's if someone said, OK, they said, well, this audit's over. We want you to come back now. But keep in mind, you're going to have to tell a bunch of lies for us. Could that be a constructive discharge? I suppose if there was a continuous pattern of that. Right. But, you know, I think what we're looking at here is that single incident and and the single email. And does that constitute intolerable conditions for some of the single incident? Is it Norton, the supervisor? Who's the supervisor? Yes, Mr. Norton. Norton. And he says, do as you're told. Correct. And then what's the email? The email is I'm going to take over the day to day supervision over the day before dispatchers. Yes. Again, was there a letter from the in-house counsel when when she was out, when Ms. Rock was out on the leave saying, are you coming back? You're going to have to come back. Or explain what the record shows about that. Correct. There were two letters and the first was in February of 2000, four months after she left work. And the letter said that's a year one twenty six to one twenty seven. The letter said basically, you know, you've been on paid leave. This really can't continue forever. We'd like your clients to come back to work and said, would you essentially set a deadline? If you don't return within a couple of weeks, we'll view you as having resigned. Then there was another letter. And what happened was in March of 2000, counsel in-house counsel for NMAC wrote again and said, you know, we talked on the phone. I want to assure you that, yes, you do still remain employees. We're agreeing to keep you on paid leave, even despite what I said in my earlier letter. So we can try and work this out. And we've made this concession to you. But, you know, you've got to come back to work. And if you don't want to come back to work in the position that you were in, you can come back to work in any position you're qualified for. And it attached a list of jobs that were open at that time. That's in March of 2000 that that letter took place. And so I think, you know, again, when you look at the question of whether it's a matter of law, there's a constructive termination and they say that the termination occurred in 2000. I think you've got to consider those facts that that that the that the plants here rejected two invitations to return to work. Now, if I may, I think I would like to briefly address the question of whether is whether there is, in fact, a clear mandate of public policy involved in in this this claim for wrongful discharge. As the court is aware that that's what the Washington courts call the clarity element. The plaintiff who claims that they were wrongfully discharged must prove the existence of a clear mandate of public policy and further establish that he or she was terminated in contravention of that policy. And it's our position that the there is no clear mandate of public policy here. The Washington courts are clear that the public policy must be clearly grounded in legislation. Wouldn't the general Consumer Protection Act embody a policy that manufacturers shouldn't lie about products meeting standards because that would deceive the public? You know, frankly, I really have no objection to the proposition that the Consumer Protection Act may state certain important public policies. For the citizens of Washington. But I think what's important here is to recognize that there was no effect on the sort of the ISO certificate, which is the only thing that the the public sees is an ISO certificate. And what's clear here is that this supposed lie would have made no difference whatsoever to that certificate. So how can a Washington consumer such as it is be confused by that? Frankly, I'm a consumer and I didn't know anything about ISO certificates till I till I got into this case. I don't know that many consumers or a substantial portion of the of the consumers at large are concerned about ISO certificates. But even if they are, the evidence is undisputed that this lie, which and let's let's be clear about what this was. It was an explanation to an ISO auditor as to why there was a decrease in the documentation of how they were handling complaints or what they call escalations. Aren't the consumers of the products of Intermec sophisticated businesses? That's correct. Like you might sell some kind of scanning equipment to Safeway grocery stores and they would use it to check their inventory or things being checked out. That's correct. Stuff like that. Yes. So, I mean, wouldn't consumers like that care about whether certifications were met? Well, again, that's why I think we need to look at what the supposed unfair deceptive act would be here again. The starting point is this is a private organization, the International Organization of Standardization. Companies voluntarily participate in the organization. No law requires them to do so or dictates any standards with which they have to comply in connection with that. Now, what what I think is important here is that amicus and their arguments have assumed that Ms. Rock was asked to assist in obtaining a false certification, an ISO certificate. But the evidence is clear that this issue, this question of the documentation of how they were handling complaints, and that's really what it's about. They were still processing complaints, but they weren't documenting those, how they were processing them in accordance with their own written procedures. And that's what ISO is all about. Are you following these procedures that are here in writing? And they were not with respect to those complaints. And the person who was involved, actually involved with the ISO audit, when this idea of trying to hide why this was occurring, why this decrease, said, wait a minute, big deal. This is a so what was her testimony. It's irrelevant to the ISO certificate. And in fact, that's why they disclosed it to the ISO auditor. And it made no difference whatsoever to the ISO certificate. And so the point that I'm trying to make here, Your Honor, is if if they if there had been a lie told about how those complaints were being processed, there still would have been a certificate. If there's no lie, there's still a certificate. And so the consumers here are not affected by this in any way. The and by the way, the the the undisputed evidence that there that this was irrelevant to the audit is provided at pages 160 and 199 of the supplemental excerpts. The other aspect of this is, too, is that Ms. Rock. Another way to look at this is to look at the jeopardy element, as they call it under Washington law, which is does the person. First of all, there are two steps to that. Unless there's imminent harm presented. The Washington courts have said there must be an actual violation of a law or policy or regulation. And we would submit that clearly there is no actual violation of law was threatened by this. Nor was there any imminent harm here. I think it's important. I'll emphasize again that ISO has nothing to do with with safety or really with the product itself. Again, it's it reviews processes that are followed at a company. But the the the other step to look at is under Washington law is that they have held that where imminent harm is presented, then they're going to say you don't have to show an actual violation of law for the employee. They could simply show that they had an objectively reasonable belief that the law might be violated. Now, again, we we don't believe that there is imminent harm present, and I think it's undisputed there was not. But let's assume that there was. So then the question is, well, what did Ms. Rock objectively believe? What law did she believe might be violated? And the fact is, under her own on her own deposition testimony, she said she had no idea of what consequences would follow if the auditors were told about how they were processing these escalations. She and that testimony is that S.E.R. 1 1 9 to 1 2 0 supplemental excerpts 1 19 to 1 2 0. What would happen if the auditors found out there was no procedure in place? I don't know exactly. Do you have any concept of what would happen? Answer I'm sure it would cause some problems for Intermec. How can how can the judicial system protect employees whose bosses tell them to lie about the operations of the companies they're working for? Well, it doesn't doesn't something tell you that that should not happen. And in America, it should not happen to the public, should not happen to employers and employees. Well, Your Honor, I think that it's you know, I mean, that's OK. Your Honor, I think that your question, though, needs to be asked. You know, there are two things to whom is the misrepresentation to be communicated. And what is the misrepresentation about? You know, if I tell an employee, don't tell the janitor who made that mess in the lunchroom. If the question is that it depends upon the lie, it depends on what the what the lie is about. And that's not a question for a jury to decide. Well, no, because there's a pure question of law presented here, which is whether a clear mandate of Washington public policy is implicated here. And it's up to the plaintiffs to establish as a matter of law. This is a question of law for a court to decide. They have to point to some legislation or prior jurisprudence which establishes that mandate of public policy. And your honor, I can't see it here. You mean you mean you mean in the state of Washington, there's nothing wrong with telling your employee to lie about the business of the operation that may affect consumers? Well, as I as I saw, there's no law or public policy or decency about that. Your honor, if if in fact consumers would be affected, there might be an issue here. But I believe I've shown that no consumers would have been affected. That's why I say who is the lie to. What's it about? And I think you need to look at that here. And I think when you do that, you see that there is no clear mandate of public policy. I will say, your honor, in creating this tort, the Washington Supreme Court has been very careful. How about generalized fraud? You've got to you've got a broad front statute that nobody can commit fraud which interests somebody else. Well, again, on these facts, your honor, I don't know where the fraud would be. Who's who's injured here? Who is defrauded here? The ISO certificate is retained whether the lie is told or not. I don't know where the detrimental reliance is there. I don't know where the injury is that flows from that. I mean, you have to bring in somebody that says they've been they've been cheated because of a lie. That's required. I think at the very least, you could show that the lie would have made a difference. You need to show that. And on this record, it's clear that it would not make a difference because they told the auditor what was going on here. You know, no lie ever took place. It seems like if the question is whether telling an employee to lie violates a public policy of the of the state, that showing specific reliance on it doesn't seem required to show a policy. I mean, the state could have a policy. We don't want employers to lie to the public. And if that's so, whether it made a difference on a particular certification or not wouldn't matter. Well, again, the point I'm trying to get at is that there would there was no lie to the public. It's what's communicated to the public is that ISO certificate. And so the communication here is to this third party, this ISO auditor that comes in. And the communication to the public is the ISO certificate. You're saying if it can't be shown that a lie to the auditor would affect. The what the auditor does, that it's not violating a public policy. Let's assume that that an employee was told to lie to their certified public accountants. And they made up a false story to give to the CPAs. Now, could somebody say that doesn't violate a public policy of the state? If they could prove that the auditors would have done the same thing anyway because of some other evidence? Well, I think that when you're talking about communications to the CPA and that's where, again, I say who the lies made to makes a difference. I mean, the CPA is auditing your books for a completely different purpose than than is the than an ISO auditor. I think, again, it's important to step back and say, well, what is this ISO thing? It's something that this company voluntarily participates in. Well, I want to get back to the point I raised at the outset of the argument by Mr. Wing. If there's not a discharge here, do we ever reach this issue? No, you don't, Your Honor. It's a that isn't a basis on which to affirm in and of itself. That's really the first question we have to ask is whether the reduction of Ms. Rock's duties after she complained about being asked to do what you're told, whether the reduction of her duties. And even while she's on pay on administrative leave amounts to a constructive discharge. Yes, Your Honor. How does that issue? How does it relate to all of Ms. Mordek's Morden's claims were dismissed. Was she discharged? Well, she she claims that she. Remind me how she ended up bringing a claim here as contrasted with Ms. Rock. Actually, temporarily, it was the first events concern Ms. Morden. She complained about saying that she thought the supervisor had a special agenda with some other worker named Hillary. And Hillary was better. Pardon me. Pardon me. Harmony was an army. Yes. So Harmony would get better training because she was a paramour or something. This is correct. So now. And what happened to Ms. Morden, though, what happened to Ms. Morden? Factually, she claimed that acts were that both, as you've pointed out, acts were taken and she raised it. This came up after an announcement that her department was going to get diminished, right? Correct. There was an announcement that the department Ms. Morden was in was going to be terminated or something. The dispatcher position was going to be eliminated. She's looking for a different post. Yes. That included herself. That included the harmony person. Those those people were going to be moved. There weren't going to be layoffs, but they were their position was going to be eliminated. So at some point, didn't she say, well, she wanted to there was some job she expected to get in a different department. But then for budgetary reasons, purportedly, that job didn't materialize. Correct. So she just did she get terminated then? No. Again, she voluntarily walked off the job and she was in the same took leave. Was she on administrative leave, too? Yes. And she got the same letter saying it's time for you to come back. Yes. The letters went to their attorney. But correct. And then also she also didn't come back and claims what a constructive discharge. She in order to satisfy her claim. The only claim she brings here is retaliation for opposing sex discrimination. She claims there that the denial of the job that she was discriminated against by denying her the new job. She was an adverse complaint about her supervisor being too close to harmony or whatever. Correct. Correct. Your Honor. And and with respect to that, the evidence showed that, in fact, there was this sales admin job, as it was called, was never filled. So then is the question. It was never filled. The company says it was for budgetary reasons. That's correct. We back into that analysis, whether that's pretextual. That's correct. That's the question. And the district court said there was no fact issue on pretext as to that position not being open. That's correct. What about whether she was entitled to some other position? Well, you know, again, that was that she was asked to come back to work. The only discrimination that the retaliatory act that she alleges was that she didn't get the job she wanted. That's correct. That's correct. And I'm at it. You're right. It's simply a question of whether there was any showing made that that was pretextual. She was dismissed on that pretrial summary judgment. That's correct. Her claims were tossed out on summary judgment. And only Ms. Rock went to trial on certain claims. That's correct. Ms. Rock went to trial on her retaliation claims under state and federal law and went to trial on, again, a wrongful discharge claim on the theory that she had been wrongfully discharged for opposing sex discrimination. Those claims were tried and the jury returned a verdict for the corporate defendants. If I if I may, if there are no other questions that the court has, I believe that the issues that are presented on this appeal have been fully briefed, and I'm happy to rely on the briefs to dispose of them. Well, you've used up your almost all your time, including the extra. I'm glad you stopped a little ahead of schedule because we're running late. But thank you. Okay. That will conclude the argument. The case is submitted.
judges: Lay , Ferguson, Gould